# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 15, 2011

## STATE OF TENNESSEE v. LARRY RANDALL HENRY, II

**Direct Appeal from the Circuit Court for Bedford County**
**No. 16883     Lee Russell, Judge**

---

**No. M2010-01175-CCA-R3-CD - Filed April 14, 2011**

---

A Bedford County jury convicted the Defendant, Larry Randall Henry, II, of aggravated burglary, and the trial court sentenced him to nine years in the Tennessee Department of Correction ("TDOC"). On appeal, the Defendant contends that the evidence is insufficient to support his conviction and that the trial court erred when it set the length of his sentence. Having reviewed the record and applicable law, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

Andrew Jackson Dearing, III, and Stephanie Baca (at trial), Shelbyville, Tennessee; and Gregory D. Smith (on appeal), Clarksville, Tennessee, for the Appellant, Larry Randall Henry, II.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; Chuck Crawford, District Attorney General, and Michael D. Randles, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the Defendant's burglary of a private residence February 20, 2009. Based on this conduct, a Bedford County grand jury indicted the Defendant for aggravated burglary. After entering a plea of not guilty, the Defendant proceeded to trial, where the following evidence was presented: Justina Crews testified that, during the 2008-2009 school year, when she was fourteen, she lived with her grandparents in Bedford County

for about four months, where she also attended school during this time. One day in February 2009, however, Justina stayed home sick from school. Both of her grandparents and her great uncle were at home initially; but her grandmother left around 10:00 a.m., and her grandfather and her great uncle left shortly thereafter, around 11:30 a.m. This left Justina alone in her grandparents' house, except for her grandparents' dog.

At some point after her family left, Justina heard a knock at the front door. Believing the person was probably a delivery man, Justina peeked through a window to verify that the person was delivering something. The man standing at the front door and knocking, however, was not wearing a uniform. Because she did not know the man, Justina went to her room at the back of the house without answering the door. From her room, Justina observed the man walk around the house several times. When she heard the man trying to open the back door, Justina went to the front of the house and peered outside and saw the man had arrived in a maroon Ford Explorer.

The man continued to try to open the doors of the house, and Justina eventually heard a side door, which opened from the garage into the kitchen, "slam" against the refrigerator door. Realizing that the man had gained entry into the home, Justina became "nervous" and "scared," so she ran into her grandparents' bedroom and hid under their bed.

From where she hid, Justina heard "rattling" as though the man was "going through stuff." She heard the man go from room to room, opening and closing drawers. When the man reached her grandparents' room and began going through their drawers, she could only see the man's feet. Soon after the man walked into the room, however, her grandparents' dog realized Justina was under the bed and began sniffing under the bed. The man crouched down on the floor and lifted the bed sheet, which hung down to the floor, to see what the dog had found. When the man lifted the sheet, Justina first noticed that his arm was tattooed and that his head was shiny and bald. The man then looked directly at Justina, and she was able to see his face well. The man had no facial hair, and his pants were black. The two locked eyes for a moment, and neither said a word. The man quickly rose without speaking and left the house. At trial, Justina identified the Defendant as the man who lifted the sheet and looked under the bed at her.

After Justina was sure she had heard the Defendant start his Explorer and drive away from the house, she got up from beneath the bed and looked around to make sure he no longer was in the house. She also noticed that the door to the garage was "messed up." Justina picked up the telephone and tried to call police, but as soon as she picked up the phone, she received an incoming call. The caller was her father's friend "Mike." She told Mike what had just occurred, and, after Mike first made sure Justina was alright, he called police, who arrived to the house soon thereafter.

2

Justina's grandmother and Mike arrived shortly after police arrived. Justina described the Defendant to police, and they brought her to the police station to look at over 130 photographs of potential suspects. She did not recognize any of the men in the photographs as the intruder. Two days later, however, police brought a page featuring the photographs of six men to the house, and Justina identified the Defendant as one of the men.

On cross-examination, Justina testified that she was lying on her belly, closer to the left side of the bed, on the opposite side of the bed from where the Defendant lifted the bed sheet to see her. She said the Defendant did not turn the light on when he came into the bedroom and that, because the blinds and curtains were closed, no natural light could enter the room. Light was coming in, however, from her grandparents' bathroom, because the Defendant had turned on the bathroom lights before he found her hiding under the bed. Justina said that she viewed the Defendant's face for only a couple of seconds before he lowered the sheet and left the room. She did not recall on which of the Defendant's arms she observed a tattoo.

On redirect examination, the State introduced a picture of a maroon Ford Explorer parked beside a house, and Justina confirmed that the vehicle pictured was similar to the vehicle she saw outside her grandparents house the day the Defendant broke into their house.

Michelle Crews, Justina's grandmother, confirmed that Justina lived with her and her husband in the spring of 2009. Her husband's brother, who was recuperating from back surgery, was also living with them during this time. She confirmed that Justina stayed home sick from school on February 20, 2009. Around 10:00 a.m. on that day, Crews left the house to buy craft supplies at Hobby Lobby. As she was driving back from Hobby Lobby, she received a phone call from her husband's brother, informing her that he had taken her husband to the hospital because he was having chest pains. Crews drove straight to the hospital, and, soon after she arrived, she received a phone call from Mike Newberry, a family friend, informing her that someone had broken into her home. Crews gave her husband an excuse for why she needed to leave the hospital, in order to not upset him further and aggravate his condition, and she immediately drove home.

Crews found Justina shaking and crying when she arrived home. She said "it was very obvious" that the door from the garage to the kitchen had been "pried open" because the door was dented in four or five places and could no longer close. She testified she and her husband always kept this door locked. Because neither she nor her husband ever noticed anything out of place or missing from their house, Crews did not believe the Defendant took anything from their house. Crews testified that she did not know the Defendant and that she had never give him permission to enter her home.

3

Officer Kevin Holton, a deputy with the Bedford County Sheriff's Department, testified that he was dispatched to the Crews home around noon on February 22, 2009, to investigate a home invasion. He found Justina, who was "very shaken up" standing in the driveway when he arrived. Justina told the officer about the intruder breaking into her grandparents' home and described the intruder and his vehicle. The officer issued an advisory to his fellow officers to "be on the look out" for a man meeting the intruder's description. Officer Holton explained that such an advisory generally requires officers to "saturate" the area of a criminal incident in order to apprehend a suspect.

Officer Brian Farris, an investigator with the Bedford County Sheriff's Department, testified that he suspected the intruder of the Crews home may have either come from or fled into Rutherford County because the Crews property was located just inside the northern boundary of Bedford County. Accordingly, at Officer Farris's direction, another Bedford County officer alerted Murfreesboro Police about the home invasion and provided them with Justina's description of the intruder. In response, the Murfreesboro Police Department provided the Bedford County Sheriff's Department with a photograph of the Defendant. Officer Farris printed this photograph along with five other photographs of men meeting the intruder's description on a piece of paper and went to the Crews's home. The officer gave the photographic line-up to Justina and asked her to identify the intruder if she recognized him by signing her name under his picture. As the officer chatted with her grandfather, Justina briefly viewed the line-up and tapped on the Defendant's picture. The officer reminded her to sign her name under the photograph of any man she recognized, and Justina signed her name under the Defendant's photograph. Officer Farris testified that he did not encourage her to select the Defendant and said that he did not tell her that she had selected the photograph provided by the Murfreesboro Police.

Later that day, Officer Farris obtained a warrant for the Defendant's arrest and traveled to the Defendant's residence in Rutherford County. When he arrived, he found a maroon Ford Explorer parked outside. The officer researched the vehicle's registration and found that it was registered to the Defendant. Rutherford County police arrested the Defendant a few days later on the Bedford County arrest warrant, and the Defendant was transported to Bedford County. At the Bedford County jail, the Defendant's arms were photographed. The State entered these photographs, which show the Defendant's arms covered in tattoos, into evidence.

The Defendant's step-father, Ricky Alan Evans, testified that he lived in Rutherford County with his wife and son. He testified that the Defendant came to his house between 8:30 and 9:00 a.m. on the day of the home invasion in this case, February 20, 2009. He explained that the Defendant had come to help him replace damaged sub-flooring. According to Evans, around 10:30 or 11:00 a.m., the Defendant went to a nearby bait shop

but was gone for only about twenty minutes.  He returned, finished the repairs, then left to pick up his children from school around 3:00 p.m.

Evans confirmed that, at defense counsel's request, he timed how long it took him to drive from his house to the Crews's home in Bedford County.  He testified that it took him thirty-three minutes to make this drive.

On cross-examination, Evans denied calling a bondsman while the Defendant was waiting to make bond and assuring the bondsman that the Defendant was innocent, explaining that a foreman in Knoxville would testify that the Defendant was performing a welding job in Knoxville on February 20, 2009.

In a jury-out hearing, the State played a recording of a telephone call the Defendant placed to his wife from jail, in which Evans can be heard in the background telling someone that the Defendant could not have committed the crime in this case because he knew of a foreman who would testify that the Defendant was performing a welding job in Knoxville. Evans then took the phone from the Defendant's wife and, speaking directly with the Defendant, said "it would be pretty hard" for him to have burglarized the Crews' home if he was in Knoxville on a welding job the day of the burglary.

When the jury was brought back in, Evans clarified that he simply "did not remember" telling the bonding company that the Defendant was in Knoxville on a welding job on the day of this crime and telling the Defendant he could not have committed the crime because he was welding in Knoxville.  He confirmed to the jury that the State played a recording in which he could be heard making these statements.  He insisted, however, that he made the statement about the Defendant being in Knoxville before he knew the exact date of the burglary in this case.

At the conclusion of the trial, the jury convicted the Defendant of aggravated burglary. At the Defendant's sentencing hearing, the following evidence was presented: According to a presentence report introduced by the State, the Defendant, who was thirty-three at sentencing, dropped out of school in the ninth grade.  He reported suffering from Tourette's syndrome, bipolar disorder, and depression, saying he received treatment for these conditions at the Guidance Center in Murfreesboro and Vanderbilt Psychiatric Unit in Nashville.  At age seventeen, the Defendant was prescribed pain medication due to a collapsed lung, and he developed an addiction to oxycontin and hydrocodone.  He stated that his addiction to these substances led him to commit burglaries and robberies in order to support his drug habit.

The Defendant has four prior convictions: one conviction for theft under $500; and three convictions for aggravated burglary, each of which was committed, respectively, in

February, March, and May of 2003. He received probation for each of his prior aggravated burglary convictions, for a total sentence of seven years on probation. This probation sentence was revoked and reinstated in 2008 and again in 2009. The probation sentence was still in effect when the Defendant committed the crime in this case.

The Defendant has married and divorced two times and had two children from his first marriage. He owed $20,000 in child support. At the time the instant offense occurred, he was living with his mother and step-father. The Defendant's sole employment as an adult had been as an iron-worker. He had worked for various independent contractors for approximately one year at a time.

Sharon Lee Evans, the Defendant's mother, testified that she worked in law enforcement when the Defendant was a young child. When the Defendant was eleven years old, an eighteen-year-old police officer with whom she worked befriended the Defendant and began molesting him. She testified that, up until this time, the Defendant had been a "normal" child. The officer who molested the Defendant was charged and tried for his conduct, and the Defendant testified against him at his trial.

Mrs. Evans testified that, when the Defendant was seventeen, his lung collapsed twice. Based on this condition, doctors prescribed the pain medication Ultrum, which was supposed to be non-addictive. When the Defendant was twenty, he was injured in a construction accident, and doctors prescribed additional pain medications. At this point, Mrs. Evans realized that her son was addicted to pain medication. His addiction began significantly affecting his life, preventing him from holding down a job, leading him to divorce from his wife and to "los[ing] his family."

Mrs. Evans testified that, since being jailed for this offense, the Defendant had undergone a significant change. He was no longer "spacey" and "flipping back and forth." She said he was "clearheaded" and had a "whole new demeanor."

On cross-examination, Mrs. Evans acknowledged that the Defendant had displayed similarly promising signs of sobriety when previously jailed for unrelated offenses but had nonetheless re-offended. She explained, however, that because he lacked health insurance, he had never been able to receive proper rehabilitation for his drug addiction.

At the conclusion of the sentencing hearing, the trial court sentenced the Defendant as a Range II offender to nine years in the TDOC. It is from this judgment that the Defendant now appeals.

## II. Analysis

6

## A. Sufficiency of the Evidence

The Defendant first argues the evidence is insufficient to sustain his conviction because it did not establish that the Defendant entered the victim's dwelling with intent to commit a felony. The State responds that the evidence is sufficient to support his conviction because it showed that the Defendant initially entered the Crews's residence with the intent to commit theft.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality

of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The Defendant in this case was convicted of aggravated burglary. A conviction for aggravated burglary requires proof that the defendant entered a habitation with the intent to commit a felony, theft, or assault and "without the effective consent of the property owner." T.C.A. §§ 39-14-402 and 403 (2006).

The evidence presented at trial, when viewed in the light most favorable to the State, established that the Defendant was unknown to the Crews's family and had never received permission to enter their home. The Defendant went to their home and knocked on the door to find out if anyone was home. When no one responded, the Defendant began trying to enter the house through the front and back doors, which were both locked. The Defendant eventually found his way into the family's garage and to the locked side door leading to the kitchen. Through means unknown, the Defendant pried open this locked door and forcibly entered the house.

While inside, the Defendant searched through the Crews's possessions, going from room to room in the house, opening and closing drawers. When he arrived in Mr. and Mrs. Crews's bedroom, he went into their bathroom, again going through drawers and turning on a hair dryer. When the Crews's pet dog realized that Justina was under the bed, he began sniffing and reaching under the bed. The Defendant looked underneath the bed to see what the dog had found and, upon realizing that Justina was hiding under the bed, immediately left the house. Neither Mr. nor Mrs. Crews found anything missing after the robbery.

We conclude that the evidence, though circumstantial, is sufficient to support the jury's finding that the Defendant entered the Crews's home with the intent to commit theft. The Defendant entered the home of a family he did not know, at a time when he believed no one was home, and he looked through the Crews's possessions, opening and closing drawers and testing electrical appliances' functionality. He immediately fled upon discovering that Justina had witnessed his actions. The circumstances surrounding the Defendant's entry into the Crews's home support the jury's inference that the Defendant entered the Crews's home

with the intent to steal the Crews's possessions. He simply abandoned his plan upon realizing that he was not actually alone in the house. Contrary to the Defendant's argument on appeal, therefore, the evidence amply demonstrated that the Defendant entered the victim's residence with the intent to commit theft. That the Defendant fled from the house empty-handed when he discovered that the victim was home does not alter the fact that, when he "entered [the victim's] habitation," he did so "with the intent to commit a . . . theft." T.C.A. §§ 39-14-402 and 403. Thus, we conclude the evidence was sufficient to support the jury's finding beyond a reasonable doubt that the Defendant, with the intent to commit theft, entered the Crews's home without their consent. *See* T.C.A. § 39-14-402, 403. He is not entitled to relief on this issue.

## B. Length of Sentence

The Defendant contends the trial court erred when it sentenced him to nine years in the TDOC because it failed to give sufficient weight to mitigating factors it found applied and failed to adjust the Defendant's sentence accordingly. The State responds that the trial court properly sentenced the Defendant.

When a defendant challenges the length, range, or manner of service of a sentence, this Court must conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2006). As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts. (2006). This means that if the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration to the factors and principles relevant to sentencing under the Sentencing Act, Tennessee Code Annotated section 40-35-103 (2006), the appellate court may not disturb the sentence even if a different result was preferred. *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. *State v. Dean*, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994).

In conducting a de novo review of a sentence, we must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 4-35-113 and -114; (6) any statistical information provided by the administrative

office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2006); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). We must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2006).

Specific to the review of the trial court's finding enhancement and mitigating factors, "the 2005 amendments deleted as grounds for appeal a claim that the trial court did not weigh properly the enhancement and mitigating factors." *State v. Carter*, 254 S.W.3d 335, 344 (Tenn. 2008). The Tennessee Supreme Court continued, "An appellate court is therefore bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Id*. at 346. The trial court shall also consider, but is not bound by, the guideline that the minimum sentence within the range should be imposed, but the sentence length, within the range, should be adjusted based on the presence or absence of mitigating and enhancement factors. T.C.A. § 40-35-210(c)(1) and (2) (2006).

The Defendant does not challenge that he is a Range II, multiple offender, convicted of a Class C felony. *See* T.C.A. § 39-14-403(b) (2009). As such, his applicable sentencing range was six to ten years. *See* T.C.A. § 40-35-112(b)(3) (2009).

In this case, at the close of the sentencing hearing, the trial court found the following three enhancement factors applied:

(1) The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;

. . . .

(8) The defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community;

. . .

(13) At the time the felony was committed, [the Defendant was on probation]

T.C.A. § 40-35-114 (1), (8), & (13) (2009). The trial court gave "great weight" to enhancement factor (1) based upon the fact that his prior convictions were for the same offense as involved in this case. It also gave "great weight" to enhancement factor (8)

because he had violated previous terms of alternative release more than one time. The trial court stated that, based on the enhancement factors applicable to the Defendant, it was going to enhance the Defendant's sentence "from six up to nine years."

The trial court found two mitigating circumstances applicable under the "catch-all" provision of mitigating circumstance of Tennessee Code Annotated section 40-35-113(13): (1) that a police officer raped the Defendant as a child; and (2) that the Defendant's poor health led him to develop a drug addiction. The trial court stated, however, that it did not give "great weight" to these factors because his sexual abuse and drug addiction had not been "causally connected in the proof to anything that happened at the home that was burglarized." Having thus minimized the impact of these mitigating circumstances, the trial court declined to reduce the Defendant's sentence from the nine years it deemed the enhancement factors to require and sentenced the Defendant to nine years in the TDOC.

On appeal, The Defendant does not contest the trial court's application of enhancement and mitigating factors. Rather, he contests its weighing of those factors, arguing that, because the trial court did not reduce the Defendant's sentence after applying two mitigating factors, it failed to properly take into account the mitigating factors. Under our sentencing law, however, the Defendant may not properly appeal the trial court's weighing of enhancement and mitigating factors. *See Carter*, 254 S.W.3d at 344. The Defendant's nine-year sentence was well within the applicable range for the Defendant. Because the trial court based the nine-year sentence on a thorough weighing of the applicable enhancement and mitigating factors, it sentenced the Defendant in a manner consistent with the purposes and principles of the Sentencing Act. *Id*. at 346. As such, we will not disturb his sentence on appeal. The Defendant is not entitled to relief on this issue.

### III. Conclusion

After a thorough review of the record and applicable law, we conclude the evidence was sufficient to support the Defendant's conviction for aggravated burglary, and the trial court properly sentenced him to nine years, to be served in the TDOC. As such, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE